FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JULY 10, 2025

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JULY 10, 2025

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 103077-1 |
| Petitioner, | ) | |
| v. | ) | En Banc |
| SHAWN LAMAR BELL, | ) | |
| Respondent. | ) | |
|  | ) | Filed: July 10, 2025 |

JOHNSON, J.—This case concerns the proper standard of review, analysis, and remedy required where a party claims that a GR 37 violation occurred. GR 37 is a court rule that outlines the process for evaluating a party's use of a peremptory challenge against a prospective juror to determine whether an objective observer could think the challenge was influenced by implicit racial or ethnic bias. When a GR 37 objection is made, the other party must articulate its reason for seeking to exclude the juror of interest—an action that is not required in the absence of a GR 37 objection. *See* RCW 4.44.140. The rule was created to effectuate the guaranteed equal protection right of any defendant "to be tried by a jury whose members are

selected pursuant to nondiscriminatory criteria" and also the right of prospective jurors to not be discriminated against in the jury selection process. *Batson v. Kentucky*, 476 U.S. 79, 85-86, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

Shawn Bell was charged with several violent crimes. After the close of voir dire questioning, the State exercised a peremptory challenge against juror 39. Defense counsel objected, citing GR 37. The prosecutor then explained and justified their decision, asserting that juror 39 was not paying attention when responding to questions and that the juror admitted to losing track of the line of questioning. The defense counsel countered that the COVID-19 mask requirement made it difficult to follow the line of questioning and responses, and that other jurors had given similar answers but were still empaneled. The defense also stated that juror 39 was one of two people of color likely to be empaneled. The trial court denied the GR 37 objection and based its decision on the juror's admission and the judge's own impressions of the juror's demeanor. Mr. Bell was convicted. He appealed, and the Court of Appeals concluded that GR 37 was violated and reversed his convictions. *State v. Bell*, No. 85684-7-I (Wash. Ct. App. Apr. 15, 2024) (unpublished),

https://www.courts.wa.gov/opinions/pdf/856847orderandopin.pdf, *review granted*, 3 Wn.3d 1012 (2024).

We hold that a de novo standard of review is required because the inquiry here is whether an objective observer could view race or ethnicity as a factor in the State's use of a peremptory challenge. A GR 37 analysis requires a particularly cautious approach because of the *could view* standard. The analysis requires a court to consider the peremptory challenge given all of the circumstances. The considerations in GR 37(g)(iii)-(v) and GR 37(i) demonstrate that an objective observer could view race as a factor. Thus, GR 37 was violated, so reversal is required. We affirm the Court of Appeals and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

Mr. Bell was charged in January 2022 with several violent crimes. The case proceeded to voir dire, a process where the attorneys from both parties question prospective jurors to screen out individuals who would face undue hardship by serving on the jury or who would be unable to serve as an impartial juror. Qualifying individuals are excluded from the jury "for cause." RCW 4.44.120. The voir dire here consisted of two sessions with a recess in between. In each session, the State began the questioning, followed by the defense. During the first session, the State posed individual questions to juror 39 at two separate times as well as a group question. The juror responded appropriately to each.

Several jurors, including juror 39, struggled to answer some questions during the defense counsel's turns. For example, during the defense counsel's first

turn, he asked whether any of the prospective jurors thought themselves to be unfair. He said, "[R]aise your hand and let us know right now and we can get you out the door and save a lot of time. Nobody." 7 Verbatim Tr. of Proc. (Mar. 10, 2022) (VTP) at 583. In response, a juror, number unreferenced in the transcript, asked, "What was the question?" 7 VTP at 583.

In that same session, the defense counsel asked juror 31 how their response to a question was different from the preceding juror's response. Juror 31 admitted that they did not remember the previous juror's response. In another instance, the defense counsel asked a question and then directed it at juror 37, who asked to have the question repeated again. Toward the end of the second session, the defense counsel asked juror 45 if he had any further impressions about a person's right to remain silent. The juror commented on his nervousness and subsequently asked what "the question [was] again." 7 VTP at 619.

The discussion topic for most of the defense counsel's turn during the second session related to the presumption of innocence and a defendant's right to remain silent. Several times throughout the discussion, the defense counsel turned to a new juror to ask their thoughts without restating the question, asked questions in the negative, or interposed his own commentary before asking another juror their thoughts. For example:

> [Defense]:   Juror No. 30, what do you think?
> [Juror 30]:   I'm not too sure that I have an opinion on the matter.

[Defense]:  Why?
[Juror 30]:  I don't really have anything to add on there.

7 VTP at 613. The defense counsel repeated his question regarding the presumption of innocence and turned to a new juror. After speaking with several more jurors, the defense counsel asked juror 37 if the defendant's right to remain silent would be a problem for them. After some back and forth, the following dialogue occurred:

[Juror 37]:  I assume either you have given up and you agree that they're not innocent or they are, that you are settled with the current state.
[Defense]:  Do you think the fact that the Defendant said nothing or if his attorney says nothing that they made a concession?
[Juror 37]:  No.
[Defense]:  Why?
[Juror 37]:  Because the burden is on the prosecution, not the defense. If the defense doesn't say nothing, then the prosecution is the only one presenting the evidence.
[Defense]:  Juror 39, what do you think?
[Juror 39]:  I wasn't paying attention. I lost track. What was the question?
[Defense]:  If I sit down, after I get [done] talking to you, and I don't say another word for the rest of this trial, what impact do you think that's going to have on the presumption of innocence for you? Would you think that's a con that my client did it?
[Juror 39]:  Like if the person kind of gave up?
[Defense]:  Yes, so would you hold that against my client?

7 VTP at 617-18. The rest of juror 39's responses indicate he understood that a defendant might strategically choose to remain silent during trial to avoid saying

5

something incriminating and choose for the defense counsel to refrain from speaking.

After voir dire, the court excused the prospective jurors until the next proceeding a week later. Then the parties alternated using their peremptory challenges against jurors one at a time. A "peremptory challenge" is when a party is statutorily permitted to exclude a prospective juror from being empaneled without justification in the absence of a GR 37 objection. RCW 4.44.140; GR 37. In this case, due to COVID-19 restrictions, each party was allowed four peremptory challenges, instead of the usual six for criminal cases. The parties were also permitted to use one additional peremptory challenge against three alternate jurors who were empaneled as backup jurors. The State used its first three peremptory challenges chronologically against jurors 12, 31, and 39. The defense objected to striking juror 39 pursuant to GR 37, which had to be addressed before the process could continue.

The State explained, "[T]he issue that we had with Juror 39 is the same as we had with Juror 31. Juror 39 specifically in response to [the defense counsel's] questioning of him kind of registered a stunned reaction and said, 'Sorry. I wasn't paying attention.'" 7 VTP at 626. The State asserted GR 37 did not apply based on juror 39's comment. The court confirmed that it recalled the juror's statement and stated that the "comments . . . he made during the voir dire process, limited though

6

they may be, seemed to demonstrate either a confusion about the circumstances that he was being questioned about or inattention." 7 VTP at 627.

In his response, the defense counsel asserted that juror 39's responses were similar to other unchallenged jurors who struggled to follow the line of questioning. He also reasoned that the mask requirement, which would be lifted the following week, made it difficult for jurors to follow voir dire. Finally, he underscored that the juror was one of two people of color likely to be empaneled.

The trial court read the GR 37 provisions out loud as it conducted its analysis. When considering the GR 37(g) circumstances, the court found that the State neither ignored nor targeted juror 39, that an apparently white juror who also lost track of the discussion was on the peremptory challenge list, and that the other listed considerations were inapplicable. As a result, the court determined that an objective observer could not view race as a factor in the peremptory challenge against juror 39.

The court concluded that GR 37(i) was also inapplicable because the juror's "inattention was corroborated by his own acknowledgment." 7 VTP at 630. The court then stated:

> My observations of him because he's sitting right in the front row is his mind was drifting throughout the questioning.
> I didn't focus on relentlessly, but, like I said, he is right in front of my field of vision. I did notice that he was potentially staring off and not completely tracking the proceedings.

7 VTP at 632. The court denied the GR 37 objection.

The court adjourned the proceeding for a week without finishing the peremptory challenge process or empaneling the jury. When the proceeding resumed, the State did not use its remaining peremptory challenges. The empaneled jury included jurors 2, 4, 6, 9, 23, 25, 26, 28, 30, 32, 37, and 41. The alternate jurors included 44, 45, and 49. The jury found Mr. Bell guilty.

Mr. Bell appealed his convictions, raising several issues, including the trial court's denial of his GR 37 objection. The Court of Appeals reversed his convictions solely because it found that the trial court erred by granting the State's peremptory challenge against juror 39 in violation of GR 37.

ANALYSIS

The first issue we must resolve is the applicable standard of review. The State argues that the trial court's observations when conducting a GR 37(i) analysis should be given deference because the subsection calls for the court's corroboration of the alleged behavior. The State also characterized the trial court's firsthand observations of juror 39's behavior during voir dire as factual findings. Mr. Bell and amici[1] argue that de novo review always applies when an appellate court is reviewing a trial court's denial of a GR 37 objection because the proper

---

[1] Amici include Center for Civil Rights and Critical Justice, Washington Association of Criminal Defense Lawyers, and Washington Defender Association, and American Civil Liberties Union of Washington Foundation.

8

perspective is whether an objective observer, not the trial judge, could find race or ethnicity to be a factor in the use of a peremptory challenge. Additionally, Mr. Bell and amici argue that the trial judge's observations were not factual findings, and thus, no deference is warranted. Despite the State's focus on GR 37(i), our analysis here is not restricted to the trial court's analysis of that subsection. Rather, we review the entire record relevant to Mr. Bell's GR 37 objection.

GR 37 does not explicitly state the applicable standard of review, so understanding the history of the rule's development is helpful to resolving the issue. Eliminating racial discrimination in the jury selection process has been an ongoing struggle since the Fourteenth Amendment was adopted into the United States Constitution. In *Batson*, the United States Supreme Court decried the State's overt racial discrimination when exercising its peremptory challenges. 476 U.S. 79. The Court provided a framework for how trial and appellate courts should address claims that racial discrimination influenced a party's exercise of a peremptory challenge. There, the Court reviewed the trial court's decision to grant a Kentucky prosecutor's peremptory challenges against four potential jurors who were the only people of color among the potential jurors. The Court instructed trial courts to evaluate both a party's prima facie case of discrimination and the other party's rebuttal to determine whether the objecting party demonstrated *purposeful* discrimination by the party exercising the peremptory challenge. The Court held

9

that Batson met his burden to show purposeful discrimination based on the State's use of peremptory challenges against all prospective jurors who were people of color. Given the emphasis on trial courts' responsibilities laid out in the framework, Washington appellate courts addressing "*Batson* challenges" reviewed trial courts' decisions for abuse of discretion. *See, e.g.*, *State v. Thomas*, 166 Wn.2d 380, 208 P.3d 1107 (2009).

In a series of cases, starting with our 2013 *State v. Saintcalle* opinion, we discussed the shortcomings of our *Batson* procedures. 178 Wn.2d 34, 36, 309 P.3d 326 (2013) (plurality opinion); *see also State v. Jefferson*, 192 Wn.2d 225, 429 P.3d 467 (2018) (plurality opinion); *City of Seattle v. Erickson*, 188 Wn.2d 721, 398 P.3d 1124 (2017). One shortcoming was the applicable standard of review. We found that reviewing the trial court's decision for abuse of discretion did little to prevent racial discrimination in the exercise of peremptory challenges. At the time of our *Saintcalle* decision, we noted that over 40 cases had presented *Batson* challenges to Washington appellate courts. Upon reviewing the list of collected cases, we determined that "Washington appellate courts ha[d] *never* reversed a conviction based on a trial court's erroneous denial of a *Batson* challenge." *Saintcalle*, 178 Wn.2d at 45-46.

With that particular limitation in mind, we more recently addressed the standard of review in *State v. Tesfasilasye*, 200 Wn.2d 345, 518 P.3d 193 (2022).

We held that de novo review applies to GR 37 objection cases because the relevant inquiry requires us to determine if an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge. We declined to defer to the trial court's "informal factual findings" at the State's request because we determined that the judge's impressions and interpretation of the challenged jurors' responses did not qualify as factual findings. *Tesfasilasye*, 200 Wn.2d at 355.

Those standards apply and control the analysis here. In this case, the trial judge recalled a statement made by juror 39 and gave an interpretation of the juror's demeanor based on his own subjective memory of voir dire. However, because the primary focus on review is whether an objective observer could view race or ethnicity in the use of the peremptory challenge, the de novo standard of review applies, as the Court of Appeals correctly determined below.

The State argues that a reviewing court lacks the benefit of viewing a juror's demeanor in person. However, when a problem with jury selection is raised, we have the benefit of being able to review the whole record, including the process and transcript of specific dialogues during voir dire—an action that would be impractical for trial court judges to take when resolving GR 37 objections during voir dire. Through our review of the transcript, we can consider the challenged juror's responses and compare those responses with other jurors' responses. We can see the parties' questions and responses. And we can see which aspects of voir

dire were considered when the trial judge reached its conclusion. Here, the judge did not recall other interactions juror 39 had with the parties, nor could he articulate the extent of juror 39's inattention with concrete examples of inattention. The judge did not compare juror 39's responses with other jurors' responses. While the judge stated he had noticed some of juror 39's physical demeanor, which he believed to be a sign of inattentiveness, he did not compare it with other jurors' demeanors. That is to say, the record lacks concrete evidence regarding juror 39's attentiveness, generally, and as compared to other jurors' attentiveness. Because we can see from the record that the judge at least partially relied on his subjective recollection of the juror's demeanor, as evidenced by his conclusory impression of the juror, the State's argument is unpersuasive.

The State also argues that the rule requires a trial judge to evaluate the total circumstances when determining the merits of an objection, so applying de novo review would undermine GR 37 instructions to trial courts. The State argues that applying deferential review would strengthen the rule by encouraging trial judges to develop the record during voir dire. Conversely, Mr. Bell and amici argue that deference in this case would weaken the protections afforded by GR 37. Because of the objective observer standard required by GR 37, appellate courts should apply de novo review when reviewing an alleged GR 37 violation in order to

prevent reverting back to the pre-GR 37 case resolution where reversal based on *Batson* challenges were rare or nonexistent.

Further exploration of the goal and scope of GR 37 is essential to the rest of our analysis. The court rule was developed to "eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a). In addition to preventing purposeful racial discrimination, the rule is aimed at preventing implicit racial and ethnic biases in jury selection, which are subconscious attitudes toward groups that influence a person's decisions without their awareness. *State v. Berhe*, 193 Wn.2d 647, 444 P.3d 1172 (2019). The rule was designed to be overinclusive in order to be effective. The court rule establishes considerations to guide courts and parties any time race or ethnicity is implicated in the use of a peremptory challenge, which better ensures the fairness in the jury selection process.

These considerations require that when a party objects to the opposing party's use of a peremptory challenge, the court must discuss the objection outside of the jurors' presence. GR 37(c). The other party exercising the peremptory challenge must explain its justification. GR 37(d). Then, the court must evaluate the reason given to justify the peremptory challenge in light of the totality of circumstances and determine if an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge. GR 37(e). An objective observer is one who "is aware that implicit, institutional, and unconscious biases, in addition

to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." GR 37(f). The *could view* standard is a sensitive standard and is an issue we addressed in *Tesfasilasye*. We underscored that trial courts must use the *could view* standard and deny a peremptory removal when its effect is discriminatory regardless of whether there was discriminatory purpose. This required approach to GR 37 objections does more to guarantee the constitutional rights of both defendants and prospective jurors than a harder-to-prove standard because their equal protection rights are at risk of being violated when there is a discriminatory effect resulting from a peremptory removal. Further, discriminatory jury selection injures the broader community and threatens to undermine the fairness of our justice system in the public's perception. *Batson*, 476 U.S. at 87-88. Because the stakes are high, and it can be extremely difficult to determine when a justification is influenced by racial bias, trial courts must be especially prudent in denying peremptory challenges in light of GR 37 objections to fulfill the rule's purpose and avoid reversal on appeal. *See Saintcalle*, 178 Wn.2d at 71, 93-94 (González, J., concurring).

The State argues that even under de novo review, an objective observer could not view race or ethnicity as a factor in its use of the peremptory challenge against juror 39 based on the totality of the circumstances. GR 37(g) is instructive and provides a nonexclusive list of five circumstances that should be considered.

First, courts should consider "the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it." GR 37(g)(i). Here, juror 39's lapse of attention took place during the defense counsel's second turn for questioning, so the State did not have an opportunity to question juror 39 about its concern. This consideration does not give rise to any concerns.

Second, courts should consider "whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors." GR 37(g)(ii). The record shows no evidence that the State targeted juror 39 by asking more or different questions than other jurors.

Third, courts should evaluate similar responses by other jurors who "were not the subject of a peremptory challenge" by the party. GR 37(g)(iii). The record in this case raises significant concerns and places juror 39's statement in context. Here, jurors 37 and 45, and potentially a third juror, each asked to have questions repeated. Their need for the question to be repeated is similar to juror 39's response. Additionally, juror 30 gave a similar response by completely deflecting the defense counsel's question when they stated that they did not have an opinion on the matter and, when pressed, that they did not have anything to add. The record

provides evidence that these jurors, similar to juror 39, had also lost track of the question. Asking that a question be repeated cannot be said to definitively be an attention lapse but instead reflects a concern as how to respond.

Fourth, courts should also assess whether the State's given "reason might be disproportionately associated with race or ethnicity." GR 37(g)(iv). Historically, inattentiveness has been given as a reason for discriminatorily using peremptory challenges against people of color to remove them from jury panels in our state. GR 37(i); *see also Saintcalle*, 178 Wn.2d at 93 (González, J., concurring) (explaining that a party often can proffer a race-neutral demeanor-based justification, which may effectively disguise racial bias).

Finally, under GR 37(g)(v), courts should consider "whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases." Here, the State used a peremptory challenge against one of only two people of color who would likely be seated, which has a discriminatory effect. The latter three considerations support a determination that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge.

Although courts are not limited to the five considerations explicitly described by GR 37, they should recognize that a party's intent when exercising a

peremptory challenge is not part of a court's analysis. This is because the court must consider the optics of the challenge from an objective observer's position.

In addition to the GR 37(g) considerations, courts should also look to GR 37(i), a subsection covering circumstances when a party relies on a juror's alleged conduct as justification for its peremptory challenge. It provides:

> The following reasons for peremptory challenges also have historically been associated with improper discrimination in jury selection in Washington State: allegations that the prospective juror was sleeping, inattentive, or staring or failing to make eye contact; exhibited a problematic attitude, body language, or demeanor; or provided unintelligent or confused answers. If any party intends to offer one of these reasons or a similar reason as the justification for a peremptory challenge, that party must provide reasonable notice to the court and the other parties so the behavior can be verified and addressed in a timely manner. A lack of corroboration by the judge or opposing counsel verifying the behavior shall invalidate the given reason for the peremptory challenge.

GR 37(i). The Court of Appeals found a reversible GR 37 violation solely on the State's failure to provide notice of its peremptory challenge in compliance with GR 37(i). *Bell*, No. 85684-7-I, slip op. at 6-7. Since the process for exercising peremptory challenges typically occurs after voir dire, notice will rarely occur until that point. Contrary to the Court of Appeals' analysis, the role of notice timing on review is minimal. A lack of corroboration by either court or opposing party is the deciding factor, regardless of the notice timing.

In its appeal of that decision, the State argues GR 37(i) is inapplicable here because the juror's inattentiveness was not an allegation but an admission of

17

inattention by the juror himself. Mr. Bell argues that the extent of the juror's inattention was unverified and that GR 37(i) was implicated. We agree. A momentary lapse in attention is insufficient to defeat a GR 37 objection. GR 37(i) is implicated anytime a party offers one of the demeanor-based justifications for its peremptory challenge, and courts should carefully evaluate proffered evidence to determine the extent of the behavior when an opposing party objects pursuant to GR 37.

The parties dispute what is required in order to notify the court and to verify and address the behavior under GR 37(i): The rule contains flexible language regarding the timing of notification—"[the] party must provide reasonable notice." It explains the purpose of notification—"so the behavior can be verified and addressed in a timely manner." But ultimately, the final sentence is dispositive in this case: "A lack of corroboration by the judge *or* opposing counsel verifying the behavior shall invalidate the given reason for the peremptory challenge." (Emphasis added.) "Corroboration" means "[c]onfirmation or support by *additional* evidence or authority." BLACK'S LAW DICTIONARY 436 (12th ed. 2024) (emphasis added). Here, the trial court found the State's justification was corroborated because the juror verified his own inattention. But the rule does not contemplate this type of verification. Rather, to corroborate the alleged inattentiveness, both judge and opposing counsel would need to agree on

18

additional evidence, although not necessarily the conclusion from that evidence, showing that the behavior was more extensive than a momentary lapse in attention. The trial judge offered his own recollection by stating that he saw the juror's "mind was drifting throughout the questioning," and that the juror was "potentially staring off and not completely tracking the proceedings." 7 VTP at 632. The judge's abstract impressions fall short of being actual additional evidence that juror 39 was entirely inattentive. Mr. Bell's attorney argued in his objection that the juror's comment merely showed a momentary lapse in attention. The record supports this characterization considering juror 39's various responses throughout voir dire. Mr. Bell's objection to the judge's alleged evidence and the judge's unverifiable observations of inattention independently demonstrate that the State's justification was uncorroborated.

We hold that under the totality of the circumstances, based on the considerations under the GR 37 requirements, an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge against juror 39 and affirm the Court of Appeals.

## REMEDY

The State argues that the Court of Appeals' reversal conflicts with this court's precedent because violations of procedural rules should be subject to harmless error analysis before concluding that reversal is warranted. This argument

19

is based on the State's theory that the only potential GR 37 violation here was the failure to provide reasonable notice pursuant to subsection (i) when exercising a peremptory challenge against juror 39. The State characterizes the violation, as well as the court rule, as procedural. Even if true, it would not preclude reversal. This court creates the framework necessary to the purpose of promoting justice by ensuring a fair jury selection process, a principle with constitutional foundations. In order to protect against the racial discrimination recognized in *Batson* and our cases, GR 37 was adopted with the goal of protecting equal protection rights guaranteed by the federal and state constitutions. The rule grew out of those constitutional concerns, and a solution cannot be uncoupled from the remedy.

We conclude that in reviewing the entire record and applying the GR 37 considerations, the total circumstances establish that an objective observer could view race as a factor in the State's peremptory challenge and that the removal of the juror violates GR 37. Therefore, the remedy is reversal and remand for a new trial. Accordingly, we affirm the decision of the Court of Appeals and remand.

Johnson, J.

WE CONCUR:

Stephens, C.J.

Yu, J.

Madsen, J.

Whitener, J.

No. 103077-1


GORDON McCLOUD, J. (concurring)—I agree with the interpretation of GR 37 in Justice Mungia's concurrence in the majority. This court enacted GR 37 "to eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a). The Justice Mungia concurrence interprets the rule correctly, and its interpretation furthers the rule's goal.

I write separately to respond to Justice Yu's call for eliminating peremptory challenges completely. Justice Yu's concurrence calls for the elimination of peremptory challenges for two main reasons: first, that GR 37 will fail at its well-intentioned goal of reducing or eliminating racial and ethnic bias in jury selection; and second, that GR 37 forces judges—trial and appellate—to speculate about a juror's racial identity based on their name and appearance. Concurrence (Yu, J.) at 1-2.

Neither premise is sound. As to the second premise, GR 37 did not force judges for the first time to determine whether a peremptory challenge is based on potential juror's perceived race or ethnicity. *Batson v. Kentucky* did that.[1] *Batson*

---

[1] 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

just did that so ineffectively that the problem of identifying the juror's perceived

race or ethnicity, and bias toward the juror based on that perceived race or

ethnicity, rarely occurred. GR 37 forced lawyers and judges to take their duty to

combat race and ethnic bias more seriously, so that they—we—really had to decide

whether race affected a peremptory challenge. That's not a bug of GR 37; that's a

feature.

As to the first premise, I certainly agree that *Batson*, and *Swain v. Alabama*[2]

before it, failed to eliminate or even much reduce racial discrimination in jury

selection. That's why we adopted GR 37 just a few years ago. *State v. Tesfasilasye*,

200 Wn.2d 345, 357, 518 P.3d 193 (2022). I would give it a serious chance before

declaring it dead.

Why would I try so hard to preserve the right to peremptory challenges?

Because they were developed for the purpose of leveling the playing field in court

between the government and the individual; they have served that purpose from the

time of their adoption to the present time; and repealing peremptory challenges

completely would have its harshest impact on the most powerless person in the

---

[2] 380 U.S. 202, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965), *overruled by Batson*, 476 U.S. 79.

courtroom, that is, the one targeted for prosecution by the government. I explain

these concerns in more detail below.

ANALYSIS

I.    Peremptory challenges have historically been used by criminal defendants to help secure the constitutional right to a fair trial, and peremptory challenges are still used for that purpose today

The federal and state constitutions both guarantee criminal defendants the

right to a fair trial. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22.[3]

The right to a fair trial includes the right to an impartial jury. *City of Seattle

v. Jackson*, 70 Wn.2d 733, 738, 425 P.2d 385 (1967) ("'[t]he right to trial by jury

includes the right to an unbiased and unprejudiced jury . . . trial by a jury, one or

more of whose members are biased or prejudiced, is not a constitutional trial'"

(first alteration in original) (quoting *Allison v. Dep't of Lab. & Indus.*, 66 Wn.2d

263, 265, 401 P.2d 982 (1965))).

Peremptory challenges—when used properly—"function as a 'state-created

means to the constitutional end of an impartial jury.'" *State v. Lupastean*, 200

Wn.2d 26, 68, 513 P.3d 781 (2022) (Gordon McCloud, J., dissenting) (quoting

---

[3] The Washington Constitution guarantees at least as much protection of the right to a fair trial as the federal constitution does. *See State v. Fire*, 145 Wn.2d 152, 163, 34 P.3d 1218 (2001) (citing *State v. Rutten*, 13 Wash. 203, 208, 43 P. 30 (1895)).

3

*Georgia v. McCollum*, 505 U.S. 42, 57, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992),

and citing *E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143, 114 S. Ct. 1419, 128 L.

Ed. 2d 89 (1994); *State v. Saintcalle*, 178 Wn.2d 34, 62, 309 P.3d 326 (2013)

(Madsen, C.J., concurring), *abrogated on other grounds by City of Seattle v.*

*Erickson*, 188 Wn.2d 721, 398 P.3d 1124 (2017)). Thus, despite the fact that the

Washington Constitution itself does not guarantee the right to peremptory

challenges, we have recognized that peremptory challenges are an important tool

for achieving this goal.

This tool is especially important for the criminal defendant. It allows the

criminal defendant—especially the indigent criminal defendant—to meet the

power of the government and to try to address widespread negative stereotypes

about those who have been charged with crimes. *Id.* at 68-69 (quoting Ela A.

Leshem, *Jury Selection as Election: A New Framework for Peremptory Strikes*,

128 YALE L.J. 2356, 2395 (2019); Nancy S. Marder, *Justice Stevens, the*

*Peremptory Challenge, and the Jury*, 74 FORDHAM L. REV. 1683, 1691-92 (2006)).

The history of the peremptory challenge is a history of protection for the

most powerless people who were hauled into court. Susan Bandes, *Taking Some*

*Rights Too Seriously: The State's Right to a Fair Trial*, 60 S. CAL. L. REV. 1019,

1043-44 (1987) (citing JON M. VAN DYKE, JURY SELECTION PROCEDURES: OUR

4

UNCERTAIN COMMITMENT TO REPRESENTATIVE PANELS 147 (1977)). In England,

during the early 1300s, Parliament passed a bill barring the crown from using

peremptory challenges in criminal prosecutions because the "earliest juries were

effectively hand-picked by the crown or its allies." VAN DYKE, *supra*, at 147

(citing An Ordinance for Inquests (1305), 33 Edw. I, Stat. 4 (Eng.)). Parliament

stated:

> If they that sue for the King will challenge any of those Jurors, they
> shall assign of their Challenge a Cause certain, and the Truth of the
> same Challenge shall be enquired of according to the Custom of the
> Court; and let it be proceeded to the Taking of the same Inquisitions,
> as it shall be found, if the Challenges be true, or not, after the
> Discretion of the Justices.

An Ordinance for Inquests; *see also* 4 WILLIAM BLACKSTONE, COMMENTARIES

*353 ("This privilege, of peremptory challenges, though granted to the prisoner, is

denied to the king by the statute 33 Edw. I. st. 4. which enacts, that the king shall

challenge no jurors without assigning a cause certain, to be tried and approved by

the court.").[4] Writing in the mid-1700s—over 400 years later—William

---

[4] Later, however, the English judiciary eventually granted the crown de facto peremptory challenges by "assum[ing] that cause exist[s] whenever the crown wants to challenge a juror. . . . Court practice thus allowed the crown to continue a procedure that Parliament had explicitly eliminated." VAN DYKE, *supra,* at 148 (citing *Anonymus* [1908] 86 Eng. Rep. 199 (KB); Edwin G. Merriam, *The Right of Prosecutors To Stand Jurors Aside*, 14 CENT. L.J. 402, 403 (1882) (quoting *Trial of Spencer Cowper*, 13 How. St. Tr. 1105, 1108 (1699)); *Trial of James O'Coigly*, 26 State Trials 1191, 1192 (1798); *Ford Lord Grey of Werk*, 9 STATE TRIALS 127, 128 (1682)).

Blackstone reiterated that Parliament designed peremptory challenges to protect

defendants in criminal trials:

> [I]n criminal cases, or at least in capital ones there is, *in favorem vitae*
> [in deference to life], allowed to the prisoner an arbitrary and
> capricious species of challenge to a certain number of jurors, without
> showing any cause at all; which is called a peremptory challenge: a
> provision full of that tenderness and humanity to prisoners, for which
> our English laws are justly famous.

4 BLACKSTONE, *supra*, at \*353.[5]

Peremptory challenges are just as important for the least powerful person in

the courtroom today. Recent Washington decisions applying GR 37 in criminal

cases show its effectiveness. *See, e.g.*, *State v. Lahman*, 17 Wn. App. 2d 925, 937-

38, 488 P.3d 881 (2021) (reversing conviction under GR 37 when State's

peremptory challenge "focus[ed] on Juror['s] . . . youth and lack of life

experiences[, which] played into at least some improper stereotypes about Asian-

---

[5] To be sure, prosecutors in the United States currently have the power of the peremptory challenge. Professor Van Dyke posits that prosecutors in the United States have this privilege because some states apparently thought that the executive branch of the United States, unlike the King of England, would not abuse its prosecutorial power. VAN DYKE, *supra*, at 149 (quoting SAMUEL ROBERTS, A DIGEST OF SELECT BRITISH STATUTES 229-30 (1817)). But United States prosecutors have not always had that power. Some states, like Virginia and New York, did not grant their prosecutors the peremptory challenge until 1824 and 1881 respectively—well after this country's founding. *Id.* at 167 (citing 3 N.Y. REV. STAT. ch. II, tit. 5, §§ 9-14, at 1028-29 (6th ed. 1875); 1881 N.Y. Laws, ch. 442, § 370, at 93; VA. CODE ANN. § 4898, at 1205 (1924)).

Americans, particularly given the lack of any record about the relative ages of

other jurors").

Other states have taken note and adopted similar rules, or called for the

adoption of similar rules, that try to eliminate race discrimination in jury selection.

*See State v. Clegg*, 380 N.C. 127, 168, 172, 867 S.E.2d 885 (2022) (plurality

opinion) (Earls, J., concurring); *State v. Aziakanou*, 2021 UT 57, ¶ 69 n.12, 498

P.3d 391; *Commonwealth v. Carter*, 488 Mass. 191, 215, 172 N.E.3d 367 (2021)

(Lowy, J., concurring); *State v. Andujar*, 247 N.J. 275, 309, 254 A.3d 606 (2021);

*State v. Porter*, 248 Ariz. 392, 405-07, 460 P.3d 1276 (Ct. App. 2020) (McMurdie,

J., dissenting), *vacated*, 251 Ariz. 293, 491 P.3d 1100 (2021).[6]

Finally, eliminating peremptory challenges leaves criminal defendants with

only for-cause challenges to secure their right to a fair trial, a wholly inadequate

remedy:

> Challenges for cause are inadequate to eliminate biased persons
> because for such a person to succeed the judge must be convinced of
> its validity. A black defendant may be thoroughly convinced of the
> racism of a potential juror because of the defendant's experience with
> the numerous subtle manifestations of racism, but the defendant's

---

[6] I note that Judge McMurdie petitioned the Arizona Supreme Court to
eliminate peremptory challenges. Concurrence (Yu, J.) at 3. Judge McMurdie's
petition does not change the fact that he cited GR 37 with approval in *Porter*.

attorney may nonetheless be unable to convince a white judge of the presence of that bias.

VAN DYKE, *supra*, at 168.

To be sure, peremptory challenges have been abused by all parties. But the government in particular has been able to use them to "make 'juries ready weapons for officials to oppress those accused individuals who by chance are numbered among unpopular or inarticulate minorities.'" *Batson*, 476 U.S. at 86 n.8 (quoting *Akins v. Texas*, 325 U.S. 398, 408, 65 S. Ct. 1276, 89 L. Ed. 1692 (1945) (Murphy, J., dissenting)). This discriminatory practice led the United States Supreme Court to adopt *Batson* in the first place, and it's why Justice Marshall, in his concurrence in *Batson*, called for eliminating peremptory challenges entirely. *Id*. at 103, 108 (Marshall, J., concurring).

But we adopted GR 37 to address the problems with *Batson*. As mentioned above, the fact that lawyers and judges now have difficulty and awkwardness when trying to decide whether a particular challenge is based on racial bias is a feature, not a bug. If *Batson* were effective, then lawyers and jurors would have had to wrestle with those issues for 50 years. But *Batson* was ineffective. GR 37 attempts to solve the *Batson* problem. We should give it a chance.

If further experience with GR 37 shows that it fails, we can consider other steps. But eliminating one of the most important protections ever developed to

ensure a fair jury for the most powerless person in the courtroom is a dangerous way to go. It risks consolidating the power of the prosecutor—the executive branch—at the expense of the criminal defendant. This does not seem like a good time to reduce protections against prosecutorial or executive overreach.

CONCLUSION

Peremptory challenges have historically played a key role in securing a criminal defendant's right to a fair trial by an unbiased jury and in protecting the individual criminal defendant from overreach by the State. Peremptory challenges continue to serve that role today. Eliminating peremptory challenges completely threatens to increase the power of the State, of the prosecutor, and of the executive branch, at the expense of the most powerless individual in the courtroom: the one charged with a crime. That's a step too far.

_____
Gordon McCloud, J.

9

No. 103077-1

YU, J. (concurring) — I concur with the majority's reaffirmation that the standard of review for addressing GR 37 claims is de novo and that the remedy for a violation of the rule is reversal. I further concur in the majority's application of GR 37 to the record presented in this case, as the majority's analysis reflects a thoughtful attempt to apply the law in light of the practical realities of voir dire.

While I agree with this standard of review, I do so only because it will require our court to take a closer look at the process of jury selection and the dynamics of deselecting jurors while we continue to wrestle with GR 37. However, despite my concurrence in this case, I remain skeptical of the idea that appellate judges, on review of a transcript, can do a better job than a trial judge of detecting implicit racial and ethnic biases in jury selection. Without doubt, there is a great deal of information that never makes it into a written transcript and that itself raises a concern about how a future court might interpret GR 37 under a de novo review

1

standard.  As demonstrated by the facts of this case, ferreting out the "real reason"
for removing a juror is not always so easy or clear.  As bias against immigrants,
members of the LGBTQ+ community, and religious minorities surface, the
limitations of GR 37 become increasingly evident.

Although the adoption of GR 37 was well intentioned, it continues to be
misconstrued and ineffective at combating bias in application, as the record in this
case demonstrates.  We know from our own review of cases, that in practice, GR 37
has been criticized because it requires judges to speculate what a prospective juror's
racial identity is based on their name and appearance.  *See, e.g.*, Paul J. McMurdie et
al., *Arizona's Elimination of Peremptory Challenges: A First Look*, 56 ARIZ. ST. L.J.
1793, 1807 & n.122 (2024) (citing Finley Riordon, Note, *The Objective Observer
Strikes Out: A Comparative Analysis of* Batson *Reform in Washington State*, 13
WAKE FOREST J.L. & POL'Y 103, 125-26 (2023)); *State v. Rivers*, 1 Wn.3d 834, 847,
533 P.3d 410 (2023) ("The [trial] court later noted for the record that Rivers's
particular jury panel had no potential jurors who appeared to be Black, though 'it's
always hard to tell with appearances.'" (quoting record)); *State v. Orozco*, 19 Wn.
App. 2d 367, 496 P.3d 1215 (2021) ("GR 37 is not about self-identification; it is
evaluated from the viewpoint of an objective observer.").

The process of removing or retaining a juror in accordance with the
procedures outlined in GR 37 is awkward and there are mixed results on whether it
has increased juror cross representation.  Thus, I remain convinced that the implicit

and institutional biases interwoven in the jury selection process cannot be adequately addressed until we completely abolish peremptory challenges.

In January 2021, Chief Judge Peter B. Swann and Judge Paul J. McMurdie from the Arizona Court of Appeals, Division One, formally petitioned the Arizona State Supreme Court to abolish peremptory challenges. *See* Pet. To Amend R.18.4 & 18.5 of Ariz. R. of Crim. Proc. & R. 47(e) of Ariz. R. of Civ. Proc., No. R-21-0020 (Ariz. Jan. 11, 2021), https://rulesforum.azcourts.gov/Rules-Forum/aft/1208. The Petition eloquently described the history of peremptory challenges in this country and pointed to the practice as a sustaining source of unlawful discrimination in our courts:

> Despite many federal and state efforts at reform over the years, Arizona (like other American jurisdictions) faces persistent problems with unlawful discrimination on the basis of race, gender, religion and other impermissible classifications in jury selection. The primary tool by which this discrimination is practiced is the peremptory strike.

*Id.* at 2.

Aware of our efforts to address the safeguards announced in *Batson v. Kentucky*[1] through GR 37, Chief Judge Swann and Judge McMurdie respectfully asserted:

> We do not believe that a Washington-style "*Batson* plus" approach will be effective enough at eliminating the role race plays in jury selection. It will, of course, generate years of collateral litigation over strikes and may even increase the number of successful challenges. But it is not a death blow to the racially inappropriate use of peremptory

---

[1] 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

3

> strikes, a solution which is easily within reach. And it does nothing to redress the indignity to which we currently subject large numbers of our citizens—telling them that though there is no cause to think they would be unfair, their participation is unwelcome simply because a lawyer dislikes the cut of their jib.

*Id.* at 14-15. The Arizona judges' assessment of our efforts rings true today.

After considering numerous proposals for reform and providing opportunities for community input, the Arizona State Supreme Court was ultimately persuaded, "that the most effective, fair, and efficient procedure was to completely eliminate peremptory strikes, while focusing on sharpening the process for removing potential jurors for cause, such as conflicts of interest or personal biases that prevent impartiality." News Release, Ariz. Sup. Ct., Arizona Supreme Court Eliminates Peremptory Strikes of Jurors (Aug. 30, 2021), https://staging.azcourts.gov/Portals/0/201/Press%20Releases/2021/083021Jury.pdf?ver=2021-08-30-165533-300 [https://perma.cc/G5S7-ETQW].

Although Arizona is the only state to have abolished peremptory challenges, jurists from other state supreme courts have echoed the same call to eliminate peremptory challenges through changes to their own rules and statutes. *See, e.g.*, *People v. Johnson*, 2024 CO 35, ¶¶ 86-87, 549 P.3d 985, 1003 (Márquez, J., specially concurring); *State v. Veal*, 930 N.W.2d 319, 340-41 (Iowa 2019) (partial plurality opinion) (Wiggins, J., concurring in part and dissenting in part). Likewise, as we strive to make our legal system more just, we should take this opportunity to learn from the experience of our sister state where preliminary data shows an overall

4

improvement in juror representation.  *See, e.g.*, McMurdie et al., *supra*, at 1813-23.

We should join the Arizona State Supreme Court and eliminate peremptory challenges.  Amending Rules 18.4 & 18.5 of R. Crim. Proc. & Rule 47(e) of R. Civ. Proc., *In re Rules 18.4 & 18.5, Rules of Crim. Proc. & Rule 47(e)*, Ord. R-21-0020 of Supreme Court of Ariz., (Ariz. Aug. 30, 2021), https://www.azcourts.gov/Portals/0/20/2021%20Rules/r-21-0020%20Final%20Rules%20Order.pdf?ver=gEgExz7HPP5mts4Uj8D8nw%3d%3d [https://perma.cc/JR5X-SSQR].  Early data has shown an increase in racial and ethnic minority representation without a surge in trial length or in the number of mistrials or convictions.  *See* McMurdie et al., *supra*, at 1814-22.  With the elimination of peremptory challenges coupled with case-specific questionnaires, extended time for juror questioning, increase in juror compensation, enhanced training for judges and attorneys, and directives to discourage judge rehabilitation of jurors, the preliminary results in Arizona have been positive.

It is time for Washington to follow Arizona's rejection of peremptory challenges and their impermissibly discriminatory results.  I reaffirm my stance that we should eliminate peremptory challenges and strengthen our development of for cause challenges.

For these reasons, I respectfully concur.

_____
Yu, J.

5

*State v. Bell (Shawn Lamar)*

No. 103077-1

MUNGIA, J. (concurring in result)—Implicit bias is like carbon monoxide—if the proper precautions are not taken, the consequences can be dire. Implicit bias can influence our decisions without our awareness.

Prospective juror (PJ) 39 was a person of color who was denied the opportunity to serve as a juror in Shawn Lamar Bell's trial. Toward the end of the voir dire process, when asked what he thought of another juror's response to a question, he replied he was not paying attention. Other than that single lapse, PJ 39 answered the questions directed at him, and, if anything, one of his responses could even be considered prosecutor friendly. The State used that lapse of attention as the reason why it wanted to exclude PJ 39 from serving on the jury. The trial court, over the defendant's objection, allowed the State to exclude PJ 39 from serving on the jury.

In 2018, we enacted GR 37 to address the dangers of implicit racial bias when peremptory challenges are used. GR 37 recognizes that one justification historically given by attorneys for excluding people of color from serving on juries was the claim that the prospective juror was being inattentive. That was precisely the claim made here. The

sole reason given by the prosecuting attorney for using a peremptory challenge to exclude PJ 39 from serving on the jury was PJ 39's momentary lapse of attention.

If a prospective juror was chronically inattentive throughout the voir dire process, and if that conduct had been timely corroborated, then the trial court may consider that conduct in performing its analysis. That was not the case here. Instead of using GR 37(i) as a shield, it appears that the State, and the trial court, used it as a sword.

In Washington, a criminal defendant is denied a fair trial when a peremptory challenge is used in violation of GR 37. When addressing a GR 37 objection, the ultimate question for the trial court is whether an objective observer (who is aware of the history of explicit and implicit race discrimination in America and aware of how that impacts our current decision-making) could view race or ethnicity as a factor in the use of the peremptory challenge. The trial court failed to answer that question here. Although the Court of Appeals correctly reversed the trial court, we granted review to provide further guidance.

While I concur with the result reached by the majority, I would approach the trial court's allowance of the peremptory challenge differently. Consistent with much of the majority, I would hold the following:

- In light of the historical and current exclusion of people of color from serving on juries because of explicit and implicit racial bias, a prospective juror being inattentive on one occasion, without more, would not preclude an objective observer from concluding that race or ethnicity may have been

2

one factor in the use of a peremptory challenge. The majority has made this holding.

- A party who wants to preserve the opportunity to exclude a prospective juror because of inattentiveness must promptly bring that assertion to the attention of all parties and the trial court so that they can observe the prospective juror and be prepared to state their observations if a peremptory challenge is made. I disagree with the majority that GR 37(i) notice may be timely if given at the end of voir dire. Majority at 17. I would explicitly hold that notice under GR 37(i) will not be timely if given after the questioning of the prospective jurors has ended.

- A trial judge's unilateral impression that a prospective juror is inattentive, not tracking, or drifting off is not part of the GR 37 analysis. The majority implies that if such unilateral impressions were somehow not "abstract," then they could properly be considered as part of the GR 37 analysis. Majority at 19. I would explicitly hold that a trial judge's unilateral impressions are not evidence and can never form part of the GR 37 analysis.

- Based on the record in this case, the trial court erred when it did not answer the essential question of whether an objective observer could view race as a factor in the use of the peremptory challenge at issue.

3

- Appellate review of a trial court's ruling on a GR 37 objection is de novo without deference to the trial court's unilateral observations. The majority has made this holding.

- Exclusion of a person from serving on a jury in violation of GR 37 requires automatic reversal. I believe the majority has reached such a holding.

I.     THE PROCESS OF EMPANELING A JURY WAS HISTORICALLY FLAWED

A. "Jury Selection" Is a Misnomer. The Process Is One of Excluding People from Serving on a Jury

A defendant in a criminal case has a constitutional right to be tried by a fair and impartial jury of their peers. *State v. Gentry*, 125 Wn.2d 570, 615, 888 P.2d 1105 (1995) (citing WASH. CONST. art. I, § 21). Civil litigants are equally entitled to a trial by an unbiased jury. *Henderson v. Thompson*, 200 Wn.2d 417, 434, 518 P.3d 1011 (2022).

It is important to remember that in Washington State, the parties don't pick, choose, or select a jury. Instead, a group of people are called to serve as potential jurors. Some of the potential jurors are excluded from serving. After all the exclusions are made, the first 6 or 12 remaining in the group will be the empaneled jury, together with alternate jurors.

To be called to serve on the jury, a person must be a registered voter or have a driver's license or "identicard." RCW 2.36.055. Accordingly, not all citizens of this state are given the chance to serve on a jury. The result is that the people who appear for jury service do not reflect the racial makeup of the counties in which they live. Recent

4

studies have found "that people of color, especially Black, Native, and Asian Americans, as well as Hispanic/Latinx Americans, were underrepresented in nearly all Washington jury pools." PETER A. COLLINS & BROOKE MILLER GIALOPSOS, AN EXPLORATION OF BARRIERS TO RESPONDING TO JURY SUMMONS 7 (June 24, 2021), https://www.courts.wa.gov/subsite/mjc/docs/2021_Jury_Study_Final_Report.pdf. These studies document that non-White respondents were underrepresented by about 2.9 percent in 2017 and 9.0 percent in 2021. *Id.* at 22 (comparing survey results to baseline citizen voting age population data). Thus, even at this early stage in the jury empaneling process, certain members of the community are excluded. *See State v. Rivers*, 1 Wn.3d 834, 861, 533 P.3d 410 (2023) ("A lack of jury diversity results from many systemic contributors.").

From the large pool, trial court judges will request a certain number of prospective jurors to be sent to their courtroom for the case to be tried. The size of that pool depends on various factors, which include the type of trial court, whether the matter is a civil or criminal matter, and the length of the expected trial.

B. <u>Prospective Jurors Will Be Excluded from Jury Service When the Trial Court Concludes That They Will Face a Hardship or Have Disqualifying Bias</u>

The first round of the exclusionary process of empaneling a jury occurs when the trial court excuses people because they will face an undue hardship or they are biased and, because of that actual or implied bias, would not be able to decide the dispute in a

fair and impartial manner. *See* RCW 2.36.100; RCW 4.44.170.[1] This is the beginning of the voir dire process.

Examples of hardship include (1) being the sole wage earner for the family when their employer is not compensating them to serve on a jury, (2) having a medical appointment that was already scheduled and would be difficult to timely reschedule, (3) having nonrefundable airfare in conflict with the trial dates. These are just a few examples, and it is within the discretion of the trial court whether to excuse a prospective juror for hardship. *State v. Smith*, 3 Wn.3d 718, 724-25, 555 P.3d 850 (2024).

Examples of disqualifying bias include (1) knowing one of the parties, (2) working in the same law firm as one of the attorneys, (3) having a financial interest in the outcome of the litigation, (4) being closed-minded and unwilling to follow the court's instructions. Once again, these are just a few examples and, as with hardship, it is within the trial court's discretion to determine whether a prospective juror's bias would prevent them from deciding the case fairly. *Id*.

After the trial court excludes prospective jurors for hardship and bias, the attorneys continue the voir dire process by questioning the prospective jurors. Voir dire allows the attorneys to determine whether prospective jurors have actual or implied

---

[1] Actual bias must be established by proof that the prospective juror probably cannot try the case impartially. *State v. Noltie*, 116 Wn.2d 831, 838-39, 809 P.2d 190 (1991). Implied bias is conclusively presumed as a matter of law in enumerated circumstances. RCW 4.44.180 (specifying the causes for an implied challenge). Jurors may also be disqualified if the court finds they are incapable of performing their duties. *See* RCW 4.44.170 (particular causes of challenge).

biases that would prevent them from deciding the case fairly. *See* RCW 4.44.170. Trial courts typically require counsel to move to strike a prospective juror for cause during the voir dire session as soon as they believe the prospective juror has demonstrated that they cannot hear the case fairly. It is within the trial court's discretion whether to grant a motion to excuse for cause. *Smith*, 3 Wn.3d at 724-25.

After the voir dire process is completed, by definition, all remaining prospective jurors can hear the case fairly—otherwise, one of the parties would have moved to excuse that prospective juror for cause and the trial court would have granted the motion.

C. Parties Are Allowed To Exclude a Certain Number of People Who Are Qualified To Serve on a Jury by Using Peremptory Challenges

In Washington, during the jury empaneling process, each party is allowed to use peremptory challenges to exclude a certain number of prospective jurors without having to show cause. There is no federal or state constitutional requirement to allow parties to have peremptory challenges. *Batson v. Kentucky*, 476 U.S. 79, 91, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). Peremptory challenges are intended to promote a defendant's right to an impartial and fair trial. *State v. Talbott*, 200 Wn.2d 731, 738, 521 P.3d 948 (2022).

Generally, in civil cases each party is given three peremptory challenges, and in criminal cases each side is given six peremptory challenges. CrR 6.4(e)(1).

   D. Until 1986, Parties Were Allowed To Exclude People from Serving on Juries
      Because of Their Race or Ethnicity

   For the first 100 years of our country's existence, states were allowed to exclude

people of color from even being considered for jury service. "All men are created equal,"

while certainly true, did not reflect how our government treated its people.

   It was not until 1879, more than 100 years after this country was founded, and

only after the Civil War and the adoption of the Fourteenth Amendment to the United

States Constitution, that the United States Supreme Court ruled that it was

unconstitutional for a state to exclude Black males from serving on a jury. *Strauder v.*

*West Virginia*, 100 U.S. (10 Otto) 303, 312, 25 L. Ed. 664 (1879) [2] (invalidating

explicitly discriminatory state statute); *Neal v. Delaware*, 103 U.S. (13 Otto) 370, 397, 26

L. Ed. 567 (1880) (vacating conviction where, despite facially neutral state statute, Black

people were uniformly excluded from jury service in the state). For years after the Civil

War, many states preserved all-White juries in order to punish Black defendants

particularly harshly and simultaneously avoid punishing violence by White people

against Black people. *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 222, 137 S. Ct. 855,

197 L. Ed. 2d 107 (2017) (quoting James Forman, Jr., *Juries and Race in the Nineteenth*

*Century*, 113 YALE L.J. 895, 909-10 (2004)).

   Even after the United States Supreme Court held that the Fourteenth Amendment

prohibited states from enacting blanket exclusions of Black people from serving on

---

[2] Even that was not a unanimous opinion, as two justices dissented in *Strauder*.

juries, states still found ways to exclude them. *See, e.g.*, *Williams v. Mississippi*, 170 U.S. 213, 222-23, 18 S. Ct. 583, 42 L. Ed. 1012 (1898) (refusing to intervene when Mississippi allowed only registered voters to be called for jury service, while its officials determined who could be a registered voter in a discriminatory manner—through poll taxes, disenfranchisement clauses, literacy tests, and grandfather clauses). Eventually, the Court began to scrutinize states' practices that resulted in the wholesale exclusion of Black people from being called for jury service. *See Norris v. Alabama*, 294 U.S. 587, 598-99, 55 S. Ct. 579, 79 L. Ed. 1074 (1935) (reversing a state criminal conviction on jury discrimination grounds for the first time since 1904 because state's practice resulted in Black people not even being called for jury service).[3] In response, states adjusted their discriminatory practices by limiting the number of Black people in jury pools. *E.g.*, *Akins v. Texas*, 325 U.S. 398, 406, 65 S. Ct. 1276, 89 L. Ed. 1692 (1945) (noting intention to have "just one" Black person on the grand jury). States also began relying more heavily on using peremptory challenges to prevent Black people from serving on juries. *See* Michael J. Klarman, *The Racial Origins of Modern Criminal Procedure*, 99 MICH. L. REV. 48, 81 (2000).

---

[3] The Court reversed other convictions on similar grounds in subsequent years. *See, e.g.*, *Patton v. Mississippi*, 332 U.S. 463, 68 S. Ct. 184, 92 L. Ed. 76 (1947); *Hill v. Texas*, 316 U.S. 400, 404, 62 S. Ct. 1159, 86 L. Ed. 1559 (1942) (for years jury commissioners "consciously omitted to place" Black people on the jury list). In *Patton*, the United States Supreme Court adopted Thurgood Marshall's argument that the Constitution does not permit indictments and verdicts from any plan resulting in Black people being systematically excluded from jury service. 332 U.S. at 469.

In 1965, the United States Supreme Court reaffirmed that a party had the right to exclude a person from serving on a jury because of the color of their skin. In *Swain v. Alabama*, 380 U.S. 202, 220, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965), *overruled by Batson*, 476 U.S. 79, the Court held that a party could use a peremptory challenge to exclude people based on their "race, religion, [and] nationality," and there was no relief for the opposing party.[4] In that case, the Court noted that Black men over age 21 made up 26 percent of all men in the county; yet, since 1950, no Black man had ever served on a jury. *Id*. at 205. In that case, there were eight prospective Black jurors. Two were exempt from jury service and the prosecuting attorney struck the other six by way of peremptory challenges. *Id*. The defendant objected, arguing that the peremptory challenges violated his Fourteenth Amendment right to equal protection of the law. The Court rejected that argument. It would be another 21 years before the Court no longer sanctioned the use of peremptory challenges to exclude people of color from serving on a jury.

E. <u>In 1986, the United States Supreme Court Ruled That a Person Could Not Be Excluded from Serving on a Jury Because of Their Race, but the Framework That the Court Adopted Was Flawed</u>

In 1986, the United States Supreme Court held that when a prosecutor used a peremptory challenge to exclude someone because of their race, that use violated the defendant's right to equal protection under the Fourteenth Amendment. *Batson*, 476 U.S.

---

[4] Three justices dissented. Constance Baker Motley, the first Black woman to argue before the United States Supreme Court, argued the use of peremptory challenges in *Swain* violated the equal protection clause. Her argument would eventually be adopted in *Batson*.

10

at 85. However, the framework that the Court provided for a remedy was wholly deficient.

In *Batson*, the prosecuting attorney used four peremptory challenges to exclude four Black prospective jurors from serving on the jury. The result was an all-White jury. The defense attorney objected. The trial court overruled the objection, stating that an attorney could "'strike anybody they want to.'" *Id*. at 83 (quoting record). This was an accurate statement of the law at that time. The Kentucky Supreme Court upheld the conviction. James Batson appealed to the United States Supreme Court.

The Court held that the use of a peremptory challenge violates the equal protection clause when a party can prove that the reason the opposing party used the peremptory challenge was because of the prospective juror's race. *See id*. at 85.

The Court developed a three-part test for a party objecting to an opposing party's use of a peremptory challenge on a person of a "cognizable racial group." *Id*. at 96.

First, the objecting party has to make a prima facie showing that the opposing party's use of the preemptory challenge was purposeful racial discrimination. The objecting party could make a prima facie showing by demonstrating to the trial court that the opposing party had a pattern of using peremptory challenges to exclude Black people when the defendant is Black. Or the objecting party could clear that bar by "showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id*. at 93-94.

11

Second, if an objecting party made a prima facie showing, then the opposing party is allowed to provide a nondiscriminatory reason for exercising the peremptory challenge. Any race-neutral reason would do: the prospective juror was too young, too old, didn't have enough education, had too much education, lived in the same area as one of the parties, etc. In other words, it was an easy bar to clear. *Id.* at 97-99.

Third, the objecting party had to prove that, in fact, even in light of the nondiscriminatory reason provided by the opposing party, the opposing party used the peremptory challenge because of the race of the prospective juror. *Id.* In short, an objecting party had the burden of proving that the party excluding the prospective juror was consciously racially prejudiced and that the reason given for the use of the peremptory challenge was a lie, and the judge had to make the same finding to sustain the objection.

Justice Thurgood Marshall concurred in the opinion. However, he saw the flaws in the three-part test. *Id*. at 102-08 (Marshall, J., concurring).

First, Justice Marshall noted that a defendant could not object to the use of peremptory challenges unless there was a pattern of excluding prospective jurors because of their race. *Id*. at 105 (Marshall, J., concurring).

Second, Justice Marshall pointed out that coming up with a nondiscriminatory reason for exercising a peremptory challenge would be easy. Because of that, Justice Marshall noted that the Court's remedy could be nothing more than an illusion. *Id*. at 106.

Third, and applicable here, Justice Marshall acknowledged that the Court's

framework did nothing to address implicit bias. As Justice Marshall explained:

> Nor is outright prevarication by prosecutors the only danger here. "[I]t is even possible that an attorney may lie to himself in an effort to convince himself that his motives are legal." A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is "sullen," or "distant," a characterization that would not have come to his mind if a white juror had acted identically. A judge's own conscious or unconscious racism may lead him to accept such an explanation as well supported. As Justice REHNQUIST concedes, prosecutors' peremptories are based on their "seat-of-the-pants instincts" as to how particular jurors will vote. Yet "seat-of-the-pants instincts" may often be just another term for racial prejudice. Even if all parties approach the Court's mandate with the best of conscious intentions, that mandate requires them to confront and overcome their own racism on all levels—a challenge I doubt all of them can meet. It is worth remembering that "114 years after the close of the War Between the States and nearly 100 years after *Strauder,* racial and other forms of discrimination still remain a fact of life, in the administration of justice as in our society as a whole."

*Id*. at 106-07 (alteration in original) (citations omitted) (quoting *King v. County of*

*Nassau*, 581 F. Supp. 493, 502 (EDNY 1984); *Rose v. Mitchell*, 443 U.S. 545, 558-59, 99

S. Ct. 2993, 61 L. Ed. 2d 739 (1979)).

## II.     THIS COURT ADOPTED GR 37 TO ADDRESS BATSON'S FLAWS AND MINIMIZE THE EFFECTS OF EXPLICIT AND IMPLICIT BIAS

### A. *Saintcalle* Called Out *Batson*'s Flaws

In *State v. Saintcalle*, 178 Wn.2d 34, 35-36, 309 P.3d 326 (2013) (plurality

opinion), we acknowledged that racial discrimination continued to corrupt the jury

empaneling process and that *Batson* was ineffective:

> [W]e also take this opportunity to examine whether our *Batson* procedures are robust enough to effectively combat race discrimination in the selection

13

of juries. We conclude that they are not. Twenty-six years after *Batson,* a growing body of evidence shows that racial discrimination remains rampant in jury selection. In part, this is because *Batson* recognizes only "purposeful discrimination," whereas racism is often unintentional, institutional, or unconscious. We conclude that our *Batson* procedures must change and that we must strengthen *Batson* to recognize these more prevalent forms of discrimination.

We recognized that excluding people from serving on juries because of racial discrimination not only harms the accused but also demeans people of color who show up for jury duty only to be turned away because of their race. *Id*. at 41. Moreover, we recognized that studies have demonstrated that diverse juries result in fairer trials than nondiverse juries. *Id*. at 50. We stated in no uncertain terms that the most damaging consequence of racial discrimination when empaneling a jury is the undermining of the public's confidence in the fairness of our legal system. *Id*. at 41-42.

Nevertheless, because we applied *Batson*, we affirmed the trial court's decision to exclude the only Black prospective juror in Kirk Saintcalle's jury pool. We reached that decision in part because the prosecutor presented race-neutral reasons for excluding the prospective juror that included inattention during voir dire. *Id.* at 40. In doing so, we recognized that Washington appellate courts had never reversed a conviction based on a trial court's denial of a *Batson* challenge. *Id*. at 45-46. Under *Batson*, we give great deference to the trial court's finding that the use of a peremptory challenge is "race-neutral." *Id.* at 55-56.

14

We acknowledged that *Saintcalle* did not present the opportunity to address these issues. We noted we had a number of options, one of which was to adopt a rule to address the deficiencies found in *Batson*. *Id*. at 55.

B. <u>We Enacted a Rule To Address Explicit Bias and, More Importantly, Implicit Bias in the Use of Peremptory Challenges</u>

After publishing proposed GR 37 for public comment, and the formation of a special task force, we enacted GR 37 in 2018.[5] *State v. Jefferson*, 192 Wn.2d 225, 243-45, 429 P.3d 467 (2018) (plurality opinion) (detailing history of GR 37). GR 37 eliminated the high bar an objecting party faced in convincing the trial court that the opposing party excluded the person of color because of intentional racial discrimination. Under the new rule, a party objecting to the use of a peremptory challenge no longer needs to prove that their opponent used a peremptory challenge out of intentional racial bias. Instead, the bar for a GR 37 objection to be sustained was intentionally set low, making it harder to remove people from the jury pool. This low bar is appropriate because peremptory challenges are used after the "for cause" challenge process has already removed from the prospective jury pool any person who could not fairly decide the case. In other words, peremptory challenges exclude prospective jurors who are qualified to decide the case.

---

[5] The proposed rule was initially numbered 36, but because of the length of time taken to adopt the rule, it was later numbered 37.

C.  The Conduct Enumerated in GR 37(i) Does Not Supersede the Requirements of GR 37(e)

In enacting GR 37, we noted that attorneys, to avoid a *Batson* challenge, came up with a number of race-neutral reasons why they excluded a prospective juror of color: the prospective juror was sleeping, inattentive, staring, or failing to make eye contact; or they had a bad attitude, demeanor, or body language; or their answers were unintelligent or confusing.  GR 37(i).

In light of the historical and current exclusion of people of color from serving on juries because of explicit, and implicit, racial bias, GR 37(i) sets out the procedure that a party must follow if it intends to exclude a prospective juror for one of these reasons. The party must provide reasonable notice to both the court and the opposing party so that the alleged conduct can be verified and addressed in a timely manner.  In enacting GR 37(i), it was not the court's intent that if a prospective juror failed to make eye contact, especially a single time, or failed to stay attentive, especially a single time, that such behavior would immunize a party's exclusion of that prospective juror from whether an objective observer could view race as a factor in the use of the peremptory challenge. The only effect this conduct would have is it would be one factor that the court could consider when performing its analysis under GR 37(e):

> The court shall then evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances.  If the court determines that an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge, then the peremptory challenge shall be denied.  The court need not find purposeful discrimination to deny the peremptory challenge.  The court should explain its ruling on the record.

### III.    THE JURY EMPANELMENT IN THIS CASE

In this case, the trial court started with a panel of 81 prospective jurors. The trial court allowed the attorneys to question a number of the prospective jurors outside the presence of the other prospective jurors because of their responses to a questionnaire. When that process was completed, 33 prospective jurors remained.

Normally the prosecuting attorney and defense attorney would be entitled to use up to six peremptory challenges each.  The trial court, exercising discretion provided by our court's emergency orders during the COVID-19 pandemic, limited each side to four peremptory challenges.[6]  In addition, the court allowed each side one peremptory challenge for the three alternates.

The trial court allotted each side two rounds of questioning with each round lasting 20 minutes.

PJ 39 was not individually questioned, but he engaged with the attorneys three times during the two rounds of questioning.

---

[6] Fifth Revised & Extended Ord. Regarding Ct. Operations, *In re Statewide Response by Wash. State Cts. to COVID-19 Pub. Health Emergency*, No. 25700-B-658 (Wash. Feb. 19, 2021), https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20Orders/25700-B-658.pdf [https://perma.cc/F2PD-LEXX]; *see also* Ord. Re: Modification of Jury Trial Proc., *In re Statewide Response by Wash. State Cts. to COVID-19 Pub. Health Emergency*, No. 25700-B-631 (Wash. June 18, 2020) (noting that in "the interest of reducing the size of jury panels, court rules providing for peremptory challenges to potential jurors are temporarily modified"), https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%Orders/Jury%20Resumption%20Order%20061820.pdf [https://perma.cc/8QG8-CKXW].

1. *The First Engagement*

[PROSECUTION]: Juror 39, a similar question to you. How would you determine whether somebody is telling the truth or how much you should trust somebody's word? Could you take your mask down, please?

THE COURT: Thursday, when we reconvene next week, the masking will be a thing of the past. It will be optional. You are always free to wear it in this court, but it will no longer be mandated. Go ahead. I'm sorry, [Prosecutor] Ms. Eaquinto.

[PROSECUTION]: Juror 39, I'll repeat the question. How do you determine whether somebody is telling the truth? What do you look for?

PROSPECTIVE JUROR [39]: Their body or eye contact, the way they speak, evidence and facts.

7 Verbatim Tr. of Proc. (Mar. 10, 2022) (TP) at 574.

2. *The Second Engagement*

[PROSECUTION]: In our juror questionnaire, we asked who in the group has served on an entire criminal trial. If you could just take a moment to put your placards up? I just have one question specific to that.

THE COURT: 11, 16, 23, 43, 39, 62.

[PROSECUTION]: Thank you. Juror No. 39, you had served on a previous criminal trial?

PROSPECTIVE JUROR [39]: Yes.

[PROSECUTION]: How long ago was it?

PROSPECTIVE JUROR [39]: About four years ago.

[PROSECUTION]: Were there any law enforcement officers that testified, any police or sheriff's department?

PROSPECTIVE JUROR [39]: I don't remember. I don't think so, no.

18

7 TP at 579-80.

3.  *The Third Engagement*

[DEFENSE (questioning PJ 37)]: Do you think the fact that the Defendant said nothing or if his attorney says nothing that they made a concession?

PROSPECTIVE JUROR [37]: No.

[DEFENSE]: Why?

PROSPECTIVE JUROR [37]: Because the burden is on the prosecution, not the defense.  If the defense doesn't say nothing, then the prosecution is the only one presenting the evidence.

[DEFENSE]:  Juror 39, what do you think?

PROSPECTIVE JUROR [39]:  I wasn't paying attention.  I lost track.  What was the question?

[DEFENSE]:  If I sit down, after I get down [sic] talking to you, and I don't say another word for the rest of this trial, what impact do you think that's going to have on the presumption of innocence for you?

Would you think that's a con that my client did it?

PROSPECTIVE JUROR [39]:  Like if the person kind of gave up?

[DEFENSE]:  Yes, so would you hold that against my client?

PROSPECTIVE JUROR [39]:  Yeah, because I wouldn't hear all of the information on everything.

[DEFENSE]: If I said a few words but he himself didn't say anything, would that be a problem for you?

PROSPECTIVE JUROR [39]: He might incriminate himself and put himself into something.

[DEFENSE]: Do you think the fact that he doesn't say a word, that I make a decision that he isn't going to say anything, do you think that in any way incriminates him in this case?

PROSPECTIVE JUROR [39]: Maybe he gives you the power to say that.

7 TP at 617-18.

Voir dire of other prospective jurors continued after the defense's questioning of PJ 39. At the end of questioning, the trial court excused the prospective jurors. The State did not move to excuse PJ 39 for cause.

The trial court had the attorneys write down the prospective jurors that the parties wanted to exclude by way of peremptory challenges. The State put PJ 39 on their list.[7] The defendant objected. The following colloquy took place between the attorneys and the trial court.

THE COURT: You have registered a <u>Batson</u> challenge against Juror 39?

[DEFENSE]: Actually, GR 37, Your Honor.

THE COURT: You checked the wrong box.

[DEFENSE]: I apologize, Your Honor. I will check the correct box.

JUDICIAL ASSISTANT: I believe the Court is going to correct it for you.

[DEFENSE]: It is a GR 37 challenge against their exercise of a peremptory challenge against Juror 39 who is a Native American or has the

---

[7] A few prospective jurors were dismissed for cause during voir dire. Following voir dire, the State made three peremptory challenges to prospective jurors 12, 31, and 39; the Defense made four challenges to prospective jurors 16, 11, 43, and 8; both parties accepted the alternate. CP at 91.

20

appearance of being a Native American, Your Honor, who said very little throughout this case, but then there have been a number of other jurors who said very little as well. I have an objection pursuant to GR 37.

THE COURT: [the Prosecutors] Ms. Eaquinto or Mr. Nelson?

[PROSECUTION]: Your Honor, the issue that we had with Juror 39 is the same as we had with Juror 31. Juror 39 specifically in response to [Defense counsel] Mr. Tolzin's questioning of him kind of registered a stunned reaction and said, "Sorry. I wasn't paying attention."

My concern, obviously, is if he is not paying attention during voir dire to the point that -- I think Mr. Tolzin was on Juror 41, but whoever it was, it was right next to Juror 39. Mr. Tolzin was inquiring of the juror right next to Juror 39.

He then moved to Juror 39, and Juror 39 said what I recited to the Court. That's my concern is that we have someone who -- this isn't [a] situation where -- and I understand under GR 37 in the past the issues have been, you know, a perception that someone is not paying attention or a perception that someone is disengaged.

In this case, this juror overtly said, "I wasn't paying attention," so that's my issue.

THE COURT: It's very difficult to determine the ethnic or racial origin of Juror No. 39. He is a person of color, I think, based on my observation of him. Whether he is a first citizen, Native American, or has some African-American heritage -- I mean, it's really hard to understand, but I will acknowledge the fact that he is a person of color.

I also heard the comment, "Sorry. I wasn't paying attention," but his comments that he made during the voir dire process, limited though they may be, seemed to demonstrate either a confusion about the circumstances that he was being questioned about or inattention.

Why don't you address that, Mr. Tolzin?

[DEFENSE]: Yes, Your Honor. I think there were a lot of jurors who didn't get the question, understand the question, thought they were talking about something else. For example, there were a number of questions -- jurors when I was talking about the impact, a preference, for

21

the police has on the presumption of innocence, tried to answer the question as an explanation for why a person might choose or why they might have a presumption or a preference for the police or why they might choose to remain silent when there was a different question.

A lot of jurors a lot of time don't fully understand the gist of the question or where we are going with the question. That was demonstrated in this case with a number of different jurors, not just Juror 39, and, again, Juror 39 simply said, "I'm sorry. I wasn't paying attention," but, on the other hand, that's also a shorthand way of saying, "I'm sorry. I didn't hear."

THE COURT: No. He said he wasn't paying attention. He didn't say, "I couldn't hear." It is not a misunderstanding or a lack of understanding about the question that was posed. It was that he just wasn't paying attention, and there is a distinction there.

[JUDICIAL ASSISTANT] Brian, could you get my local rules?

[DEFENSE]: There are other jurors who [had] given similar answers to –

THE COURT: Just a minute, Mr. Tolzin.

[DEFENSE]: Yes, Your Honor.

THE COURT: The relevant portion of GR 37 talks about reasons that are presumptively invalid for a GR 37 challenge. These include having prior contact with law enforcement, expressing a distrust of law enforcement, or a belief that law enforcement officers engage in racial profiling, having a close relationship with people who have been stopped, arrested or convicted of a crime, living in a high-crime neighborhood, having a child outside of marriage, receiving State benefits, and not being a native English speaker. None of those presumptively invalid reasons are present in this case.

Other circumstances to consider have to do with the number of questions that were posed to the prospective juror and whether there was an imbalance between those questions and the questions asked of the rest of the panel.

22

I think that everybody -- the big panel, that everybody addressed Juror 39, and I didn't think that he was unnecessarily either ignored or targeted.

Other prospective jurors provided similar answers, but were not the subject of a peremptory challenge by the party making this challenge, the State. In contrast to that, correctly, the State has indicated that Juror 31 said that at one point they weren't paying attention, and they now appear on the challenge list.

Whether a reason disproportionately associated with race or ethnicity. I don't think that applies, and whether a party has used peremptory challenges disproportionately against a given race or ethnicity in the present case or in past cases.

I have insufficient knowledge, but reliance on conduct under subsection (i) talks about the following reasons for peremptory challenges that have historically been associated with improper discrimination in jury selection in Washington State, allegations that the prospective juror was sleeping, inattentive, or staring or failing to make eye contact.

It goes on with some other descriptions of conduct that are not applicable here. It goes on to state if any party intends to offer one of these reasons or a similar reason as to the justification for a peremptory challenge, that party must provide reasonable notice to the Court and the other parties so the behavior can be verified and addressed in a timely manner. A lack of corroboration by the judge or opposing counsel verifying the behavior shall invalid[ate] the given reason for the peremptory challenge.

In this case, however, Juror 39's inattention was corroborated by his own acknowledgment, and he even said so. It is on the record.

[DEFENSE]: Again, Your Honor, the problem is that they have used that against Juror 39. They have used it again Juror 31, who I did not make a GR 37 objection for, but who does have an apparent -- at least to me an Asian ancestry.

THE COURT: I don't know about that, and I don't think that the record is at all clear about that.

23

[DEFENSE]: We don't ask for their ethnic background. We were not allowed to ask for their ethnic background on the questionnaires –

THE COURT: You can't.

[DEFENSE]: -- so I can't say. But she does have an apparent ethnic ancestry to me. They are using that for her. It is basically when we are in a courtroom where people who are having to wear masks and it is warm and he basically said that he wasn't paying attention.

But, on the other hand, when the question was addressed to him, he was able to answer the question. And, again, there are other jurors who I believe gave similar, if not identical answers, similar answers indicating that they had not heard properly or they asked me to repeat the question. That, to me, Your Honor, is an indication is it's the same thing.

THE COURT: It may be the same thing to you, but that's not what that means to me. Go ahead.

[DEFENSE]: Based upon that, Your Honor, based upon the fact that the only Native American or apparent Native American in this courtroom was Juror 39 and they are exercising a peremptory against him –

THE COURT: I don't believe we have evidence that he is Native American. He is a person of color, but his ethnicity is unknown.

[DEFENSE]: Based upon that, Your Honor, I am asking that -- he is the only person of color who was a male who is actually going to make it onto this panel who is not numerically prohibited from making this jury other than Juror No. 1, who, I believe, is also of Asian descent.

Your Honor, I, again, would renew the objection. I'm sure the Court is going to make a ruling.

THE COURT: I am going to make a ruling, and then I am going to favor you with an observation.

I don't think that this falls under GR 37 for the reasons that I have already stated. I don't see a disproportionate number of questions or ignoring Juror 39. By his own admission, he wasn't paying attention. My observations of him because he's sitting right in the front row is his mind was drifting throughout the questioning.

24

I didn't focus on relentlessly, but, like I said, he is right in front of my field of vision. I did notice that he was potentially staring off and not completely tracking the proceedings.

I'm going to deny the challenge. I would also observe, Mr. Tolzin, that if we didn't have peremptory challenges, we wouldn't be having this discussion.

[DEFENSE]: And I would note, Your Honor, if we didn't have peremptory challenges, I wouldn't have been able to get rid of two jurors who I think are clearly biased in this case. But that's neither here nor there because you denied those objections, and I have had to deal with those jurors throughout my peremptory challenges.

I understand the Court's position. We are entitled to peremptory challenges, and I'm using my peremptory challenges appropriately. I am objecting when the State has used one which I think is in a manor [sic] which violates GR 37.

THE COURT: And appropriately so, and I'm going to decline your challenge. Mr. Nelson?

7 TP at 625-33.

IV.     THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S GR 37 OBJECTION

A.  <u>An Objective Observer Could Conclude That Race Was a Factor When the Prosecuting Attorney Used a Peremptory Challenge To Exclude PJ 39 from Serving on the Jury</u>

An objective observer, watching voir dire, could have concluded the following about PJ 39:

- He was a person of color.

- He considers a person's body language, eye contact, the way they speak, evidence, and facts to determine that person's credibility.

25

- He previously served on a jury in a criminal case.

- He would hold it against a defendant if a defendant did not take the stand because he wouldn't have heard all the information.

- He thinks that if a defendant doesn't testify because the attorney advised him not to testify, that the defendant gave the attorney the authority to make that decision.

- He did not pay attention to a question directed to another prospective juror that was sitting next to him.

- When he was asked a direct question, he answered the question.

- When the prosecutor asked a question to the entire panel, he responded by raising his placard.

I am accepting that PJ 39 was not paying attention to the question asked of the prospective juror sitting next to him because he admitted that. For anyone who has ever sat through voir dire, it would be uncommon for someone not to tune out at some point in the process—especially during the second half of the last round.

Under GR 37, intent is no longer part of the equation, so we no longer look to determine whether the prosecuting attorney in fact intended to exclude PJ 39 because PJ 39 was a person of color. Instead, after a GR 37 objection, the trial court must determine, looking at all the circumstances, whether an objective observer could conclude that race or ethnicity was a factor in the use of the peremptory challenge. GR 37(d), (g). An objective observer is someone who is aware that implicit, institutional, explicit, and

unconscious biases have resulted in the exclusion of prospective jurors in our state. GR 37(f).

Here, the trial court erred by not following GR 37's procedure and, instead, apparently relying on its own, unverified, impressions.

First, the trial court never made a ruling as to whether an objective observer, considering all the circumstances, could conclude that race was a factor in the exclusion of PJ 39. Instead, the trial court reviewed subsections (g) and (i), concluding:

> I am going to make a ruling, and then I am going to favor you with an observation.

> I don't think that this falls under GR 37 for the reasons that I have already stated. I don't see a disproportionate number of questions or ignoring Juror 39. By his own admission, he wasn't paying attention. My observations of him because he's sitting right in the front row is his mind was drifting throughout the questioning.

> I didn't focus on relentlessly, but, like I said, he is right in front of my field of vision. I did notice that he was potentially staring off and not completely tracking the proceedings.

> I'm going to deny the challenge.

7 TP at 632.

It appears from the record that the trial court was engaging in a *Batson* analysis and concluded that the defendant did not prove that the prosecutor used the peremptory challenge as a result of purposeful discrimination.

Indeed, it appears that both the prosecutor and the trial judge used intent as a factor by relying on the fact that the prosecutor also used a peremptory challenge to

exclude PJ 31, who also stated that she had not been paying attention at one time.[8] The trial court should not be attempting to determine the attorney's intent for using the peremptory challenge. That was a major flaw in the *Batson* analysis. Short of extraordinary circumstances, it is impossible to determine the attorney's intent in excluding a person of color from serving on the jury. In fact, as Justice Marshall noted, the attorney themselves may not know whether implicit bias was a reason they used the peremptory challenge. While they may be telling themselves that the reason they want to exclude that prospective juror from serving is because of a momentary lapse in attention, implicit bias played a role in that decision.

Moreover, there can be multiple reasons why an attorney excluded a prospective juror of color. GR 37 does not require the trial court to conclude that race or ethnicity was the major, "but for," or likely reason that the attorney excluded a prospective juror of color. Instead, the trial court, placing itself in the role of an objective observer, determines whether it is possible that race or ethnicity could have been a factor in the use of that peremptory challenge.

Looking at the facts listed above, it appears the trial court found that an objective observer could conclude that race was *not* a factor in the use of the peremptory challenge. However, that is not the test. The test is the opposite, and here, an objective observer who is aware of implicit bias could certainly conclude that race not only could have been

---

[8] The record notes that there was a dispute as to whether PJ 31 was a person of color. For purposes of this analysis, I assume she was not a person of color.

28

but in fact likely was the reason why this peremptory challenge was used. If anything, one of PJ 39's responses could be viewed as prosecutor oriented.

An objective observer could certainly conclude that implicit bias was a reason the prosecutor excluded PJ 39. In other words, while the prosecutor consciously believes (in fact, likely strongly believes) that the reason he excluded PJ 39 was because PJ 39 was not paying attention to a question being posed to another prospective juror, his implicit bias, which by definition is unconscious, was the reason why, even with a prosecutor-oriented response, he chose to exclude this prospective juror of color. However, to make this clear, why the prosecuting attorney excluded PJ 39 from serving on the jury is not part of the GR 37 analysis. It is possible that neither race nor ethnicity was a factor at all in his decision to exclude PJ 39 from serving on the jury. But that is not the test. The test is whether an objective observer, not being able to delve into the psyche of the prosecuting attorney, could view race or ethnicity as a factor in the use of the peremptory challenge.

The State argued that race was not a factor because it also excluded PJ 31 for being inattentive.[9] That is also not part of the analysis because an objective observer would not be able to conclude that the prosecuting attorney excluded PJ 31 only because that potential juror was inattentive. There could have been other reasons; for example, PJ

_____

[9] That assertion is not supported by the record. This was another instance when one of the attorneys asked a prospective juror how another prospective juror answered a question. PJ 31 did not state that she wasn't paying attention. Instead, she replied that she couldn't remember what the other prospective juror's response was to a question. *See* 7 TP at 585.

31 answered a juror questionnaire before voir dire that contained information that could have provided multiple reasons why the prosecuting attorney decided to exclude PJ 31. Fundamentally, the fact that the prosecuting attorney excluded PJ 31 does not foreclose an objective observer from concluding that one possibility was that race was a factor in the prosecuting attorney excluding PJ 39 in addition to being inattentive.

B. <u>The Trial Court's Unilateral Impressions of PJ 39 Should Not Have Been Part of the GR 37 Analysis</u>

In denying the defendant's GR 37 motion, the trial court offered the following impressions: that PJ 39's "mind was drifting throughout the questioning" and "that he was potentially staring off and not completely tracking the proceedings." 7 TP at 632.

These unilateral impressions are irrelevant to the GR 37 analysis.

First, the trial court stated that it was watching PJ 39 throughout the questioning and that PJ 39's mind was drifting throughout that time, and PJ 39 was potentially staring off and not completely tracking the proceedings. The trial court did not state why it had the impression that PJ 39's mind was drifting throughout the questioning. That type of conclusory remark does not add to the GR 37 analysis. Moreover, that remark appears to be belied by the record where, whenever PJ 39 was asked a direct question, he provided an answer. The trial court's impression could be the effect of implicit bias itself. A corollary to implicit bias is confirmation bias—scrutinizing another to confirm one's biases. In other words, if someone holds the implicit bias that a person of color is less likely to pay attention than a White person, they will scrutinize that person to confirm

30

that bias. That was one reason for the notice requirements of GR 37(i)—when a party believes that a prospective juror is inattentive to the point where it is chronic, they must notify both the opposing party and the judge so that others can either confirm or not confirm that observation. Apparently, neither the two prosecuting attorneys nor the defense attorney had seen PJ 39 being inattentive before that last questioning because none of those three attorneys brought it to the court's attention.

Under a GR 37 analysis, unless the parties and the court are put on notice that someone believes that a prospective juror is being inattentive, that allegation cannot be included in the GR 37 analysis. To make this clear, the one instance of PJ 39 being inattentive was properly part of the GR 37 analysis. The allegation by the trial court that PJ 39's mind had been drifting off, that he wasn't tracking, and that he was potentially staring off throughout the voir dire should not have been part of the trial court's GR 37 analysis.

   C. Notice Under GR 37(i) Must Be Given as Soon as Possible and Cannot Be Given
      at the End of Questioning the Prospective Jurors

   GR 37(i) provides, in part:

   If any party intends to offer one of these reasons or a similar reason as the
   justification for a peremptory challenge, that party must provide reasonable
   notice to the court and the other parties so the behavior can be verified and
   addressed in a timely manner.

   The majority spends a fair amount of time analyzing whether the requirements of GR 37 were satisfied here and concluded the role of "notice timing on review is minimal" because a lack of corroboration is "the deciding factor." Majority at 17. I have a

31

different view.  Timing is important at the trial court proceedings and on appellate

review.  Notice given late will result in lack of corroboration.  Not only must notice be

given before voir dire ends, but it must be given as soon as possible.

1. *Notice Must Be Given Before Voir Dire Concludes*

The purpose of requiring a party to give notice is so the opposing party and the

judge can either verify or disagree with that claim.  Making a claim at the end of voir dire

doesn't allow the opposing party and the judge to observe if the alleged behavior is

occurring.  If such a claim isn't made until the end of voir dire, it is difficult to believe

that the prospective juror had been inattentive throughout the process—if they had been,

the party would have provided that notice earlier.  Therefore, the claim of a prospective

juror not being attentive at the end of voir dire cannot be part of the GR 37 analysis.

I would explicitly hold that notice under GR 37(i) will not be timely if given after

the questioning of the prospective jurors has ended.  If notice of a prospective juror's

inattention is not given until the peremptory challenges are made, then the purpose of

providing notice is defeated.  The purpose for the notice is so that others can corroborate

the alleged inattention.

2. *Notice Must Be Given as Soon as Possible*

Notice under GR 37(i) must be given as soon as possible—that is not a difficult

requirement.  At the pretrial conference, the trial court could set out the procedure when a

party wants to confirm a prospective juror's conduct under GR 37(i).  One method would

be to have a sheet ready that both parties can write down the prospective juror's number

32

and alleged conduct to be initialed by the opposing party and handed to the court while voir dire is being conducted. Another method would be for an attorney to stand after noticing the conduct and ask the court for a brief sidebar for a GR 37(i) matter. These are only two suggestions, and there are likely other options where notice can be given quickly while still keeping the voir dire process moving along.

Here, the notice requirement doesn't come into play because there was only the one instance of PJ 39 being inattentive that could be considered for GR 37 purposes. The record shows that PJ 39 was not paying attention to the question being asked of another prospective juror. The trial court's claim that PJ 39 had prior instances of being inattentive, for reasons given earlier, could not be part of the GR 37 analysis.

V.     THE STANDARD OF REVIEW FOR A GR 37 RULING SHOULD BE DE NOVO

In *State v. Tesfasilasye*, 200 Wn.2d 345, 355, 518 P.3d 193 (2022), we stated that we would review the appeal de novo, but we left for another case what the standard of review should be in a GR 37 appeal.

I believe it should be a de novo standard of review without deference to the trial court's unilateral observations.

Appellate courts stand in the same position as the trial court in performing the GR 37 analysis. The trial court must know that the record must be complete so the appellate court can review it and rerun the GR 37 analysis based on that record. The trial court's own observations, without verification of the parties as to the conduct or behavior of prospective jurors, may not be used in performing the GR 37 analysis. Appellate courts

33

should not defer to these observations because those observations may be tainted by implicit bias themselves.

As discussed, in *Saintcalle* we applied a clear error standard of review to affirm the trial court's conclusion that there was no purposeful discrimination because that case did not present an opportunity to address the deficiencies found in *Batson*. 178 Wn.2d at 41. Amici persuasively show that appellate review of a trial court's GR 37 rulings with a deferential standard will not prevent discrimination in jury selection, and the extra scrutiny will mitigate harmful implicit bias. Br. of Amici Curiae Ctr. for Civ. Rts. & Critical Just. et al. at 14-15 (quoting Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of* Batson*, and Proposed Solutions*, 4 HARV. L. & POL'Y REV. 149, 162 (2010); Jeffrey J. Rachlinski et al., *Does Unconscious Racial Bias Affect Trial Judges?*, 84 NOTRE DAME L. REV. 1195, 1231 (2009)).

There is no need to defer to the trial court's determination of whether an objective observer, viewing the jury empaneling process, could view race as a factor in the use of the peremptory challenge. The parties and the trial court have an opportunity to put on the record what they think is relevant to GR 37, including appearance, demeanor, tone, and body language. The trial court should state on the record its analysis as to how it came to its conclusion. This could include the conduct noted in GR 37(i) as long as notice was given and that postnotice conduct was verified by either the judge or the opposing party. As noted above, this is simply one piece of information that the trial

court should use in its determination. All of that information will be contained in the record, which provides the appellate court the ability to review the decision de novo.

## VI.    A GR 37 VIOLATION REQUIRES AUTOMATIC REVERSAL

An appellate determination that the trial court erred in overruling a GR 37 objection cannot be a harmless error. Instead, it is an error requiring automatic reversal.

The State argues that GR 37's notice provision is a procedural rule subject to the harmless error analysis. As I discussed earlier, I do not believe that there is any notice issue involved in this appeal. Instead, the trial court simply performed the GR 37 analysis incorrectly and never answered the determinative question of whether an objective observer could view race as a factor in the use of the peremptory challenge.

We enacted GR 37 to protect the constitutional rights not only of defendants but also of prospective jurors. *Jefferson*, 192 Wn.2d at 242. As noted above, a diverse jury panel is critical to ensuring the legitimacy of jury trials. Even under *Batson*, the wrongful exclusion of a juror required reversal because that wrongful act violated the constitutional rights of the defendant and prospective juror and undermined the public's confidence in the legal system. *See Rivera v. Illinois*, 556 U.S. 148, 161, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009) (discussing cases requiring automatic reversal). To protect these values, automatic reversal of a GR 37 violation is required.

VII.   CONCLUSION

In our country, and in our state, explicit and implicit racial bias has historically impacted the process of empaneling juries. Those impacts continue to this day.

*Batson* had the goal of addressing those impacts. The framework set out in *Batson* has failed in achieving its goal—this is especially true in failing to address implicit bias.

In response, we enacted GR 37. In GR 37(i) we noted claims that were historically used to provide a race-neutral reason for excluding people of color from serving on juries, including the claim of inattention during voir dire. We set out the procedure for the trial court to follow before it could consider the claim of inattention in its analysis as to whether an objective observer could view race or ethnicity as a reason for the use of the peremptory challenge. That procedure must be followed. In addition, under GR 37, a single instance of inattention does not override all other factors for the court to consider in determining whether an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge. Finally, trying to determine the attorney's intent in using the peremptory challenge is not part of the GR 37 analysis.

Here, the trial court failed to follow GR 37's procedure and answer the question of whether an objective observer could view race as a reason why the prosecuting attorney used a peremptory challenge to exclude PJ 39 from serving on the jury. That was error. My review of the record leads me to conclude that the answer to the GR 37 question is yes—an objective observer could view race as a reason for the use of the peremptory

challenge.  I concur in result with the majority affirming the Court of Appeals and

remanding for a new trial.

_____
Mungia, J.

_____
González, J.

_____
Gordon McCloud, J.

_____
Montoya-Lewis, J.